Thomas N. McCormick (CA Bar No. 325537)
tnmccormick@vorys.com
**VORYS, SATER, SEYMOUR AND PEASE LLP**
4675 MacArthur Court
Suite 700
Newport Beach, CA 92660
Telephone: (949) 526-7903
Fax: (949) 383-2384

Kenneth J. Rubin (*admitted pro hac vice*)
kjrubin@vorys.com
Timothy B. McGranor (*admitted pro hac vice*)
tbmcgranor@vorys.com
Kara M. Mundy (*admitted pro hac vice*)
kmmundy@vorys.com
**VORYS, SATER, SEYMOUR AND PEASE LLP**
52 East Gay Street, P.O. Box 1008
Columbus, OH 43216-1008
Telephone: (614) 464-6400
Fax: (614) 719-6350

*Attorneys for Plaintiffs and Putative Class*

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| Sean Colvin, Everett Stephens, Ryan Lally, Susann Davis, and Hope Marchionda *on behalf of themselves and all others similarly situated*, <br><br> *Plaintiffs,* <br><br> *v.* <br><br> Valve Corporation, <br><br> *Defendant.* | Case No. 2:21-cv-00801-VAP-AS <br><br> **FIRST AMENDED CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:** <br> 1) VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1) <br> 2) VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2) <br><br> **DEMAND FOR JURY TRIAL** <br><br> Judge Virginia A. Phillips <br> Magistrate Judge Alka Sagar |

## INTRODUCTION

1.     Valve Corporation's Steam platform is the dominant platform for game developers to distribute and sell PC games in the United States.

2.      But the Steam platform does not maintain its dominance through better pricing than by rival platforms.

3.      Instead, Valve abuses the Steam platform's market power by, upon information and belief, requiring game developers to agree to give Valve either an explicit "Most Favored Nations" provision, or forcing game developers to agree to what is in effect a "Most Favored Nations" provision via Valve's anticompetitive conduct.   Because of Valve's conduct, upon information and belief, the game developers agree, or otherwise capitulate to Valve's demand, that the price of a PC game on the Steam platform will be the same price the game developers sell their PC games on other platforms.

4.      Because of this Most Favored Nations provision, or "MFN," and because of Valve's anticompetitive conduct, other platforms are unable to compete on price, thereby insulating the Steam platform from competition.   The MFN and Valve's conduct have the effect of keeping prices to consumers high, as price competition by platforms would cause the prices of PC games sold to consumers to decrease.   The MFN and Valve's conduct also hinders innovation and suppresses output, as they act as an artificial barrier to entry by potential rival platforms and as higher prices lead to less sales of PC Games.

5.      During the pandemic, PC game purchases and usage have exploded, as more and more Americans are spending more and more time at home.   According to Valve:

> While Steam was already seeing significant growth in 2020 before COVID-19 lockdowns, video game playtime surged when people started staying home, dramatically increasing the number of customers buying and playing games . . . . This has led to new highs for monthly active users (120.4 million), daily active users (62.6 million), peak concurrent users (24.8 million), first-time purchasers (2.6 million per month), hours

of playtime (31.3 billion hours), and the number of games purchased (21.4% increase over 2019).[1]

6.    This court should stop the Steam platform's abuse of its market power, prevent it from entering into explicit or tacit MFNs with game developers, prevent it from requiring, forcing, or coercing game developers to price games on Steam at no less than the price on other platforms, or prevent it from otherwise agreeing with game developers as to their prices, and order that the Class recover treble damages.

## DEFINITIONS

7.    For purposes of this Complaint, the following definitions apply.

8.    An "MFN" is a "Most Favored Nation" agreement between platforms and sellers, which can either be explicit or implicit, about the prices that sellers will charge buyers who purchase through rival platforms.

9.    A "PC game" is a type of computer game played on a personal computer as opposed to a video game console or mobile device.

10.    A "platform" facilitates economic transactions between parties and is a means by which game developers sell their PC games to consumers. Game developers market their PC games on platforms and set the price of those games. A consumer purchasing a PC game pays the platform for the privilege of downloading/playing a game, and the platform remits those proceeds, minus a commission, to the game developer. Steam is a platform owned by Valve.

11.    A "game developer" develops, markets, publishes, and/or sells PC games to consumers. The dominant way consumers purchase games is via platforms—specifically, the Steam platform.

## PARTIES

12.    Plaintiff Sean Colvin is a resident of Carlsbad, California. Mr. Colvin regularly purchases PC games on the Steam platform. Accordingly, Mr. Colvin has

---

[1] Steam, https://store.steampowered.com/news/group/4145017/view/2961646623386540826 (last visited March 22, 2021).

**FIRST AMENDED CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

been forced to pay supracompetitive prices for those PC games because of the Steam MFN (as defined below) and because of Valve's monopolistic conduct.

13.     Plaintiff Everett Stephens is a resident of Cincinnati, Ohio.  Mr. Stephens regularly purchases PC games on the Steam platform.  Accordingly, Mr. Stephens has been forced to pay supracompetitive prices for those PC games because of the Steam MFN and because of Valve's monopolistic conduct.

14.     Plaintiff Ryan Lally is a resident of San Diego, California.  Mr. Lally has purchased PC games on the Steam platform.  Accordingly, Mr. Lally has been forced to pay supracompetitive prices for those PC games because of the Steam MFN and because of Valve's monopolistic conduct.

15.     Plaintiff Susann Davis is a resident of Bowling Green, Kentucky.  Ms. Davis has not agreed to the Steam Subscriber Agreement.  Ms. Davis purchases PC games on the Steam platform for her minor child, who has his own Steam account.  Accordingly, Ms. Davis has been forced to pay supracompetitive prices for those PC games because of the Steam MFN and because of Valve's monopolistic conduct.

16.     Plaintiff Hope Marchionda is a resident of Bowling Green, Kentucky.  Ms. Marchionda has not agreed to the Steam Subscriber Agreement.  Ms. Marchionda purchases PC games on the Steam platform for her minor child, who has his own Steam account.   Accordingly, Ms. Marchionda has been forced to pay supracompetitive prices for those PC games because of the Steam MFN and because of Valve's monopolistic conduct.

17.     Defendant Valve operates a platform for game developers to sell PC games to consumers called "Steam."  Valve has its principal place of business in Bellevue, Washington.  It is estimated that the Steam platform has a 75% share of the relevant market, as defined herein.

18.     Valve, via the Steam platform, has market power in the relevant market.

**JURISDICTION AND VENUE**

19.    The United States District Court for the Central District of California has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), because this action arises under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 & 2) and Section 4 of the Clayton Act (15 U.S.C. § 15(a)).

20.    Venue is proper in the United States District Court for the Central District of California because Defendant is found in, has agents in, and transacts business in the Central District of California as provided in 28 U.S.C. § 1391(b) and (c) and in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 & 22).

21.    The United States District Court for the Central District of California has personal jurisdiction over Defendant because, inter alia, it: (a) transacted business throughout the United States, including in the Central District of California; (b) had substantial contacts with the United States, including in the Central District of California; and/or (c) was and is engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in the Central District of California.

**ANTITRUST LAWS PROTECT COMPETITION**

22.    Antitrust laws in the United States generally proscribe certain mergers, acquisitions, and business practices, leaving it up to regulatory agencies and courts to apply the general laws to ever-changing markets and business relationships.

23.    Although application of antitrust laws by regulatory agencies and courts depends on the facts and circumstances of each case, the antitrust laws all have the same basic objective: "to protect the process of competition for the benefit of consumers, making sure there are strong incentives for businesses to operate efficiently, keep prices down, and keep quality up." *The Antitrust Laws*, Federal Trade

Commission, https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/antitrust-laws (last visited March 22, 2021).

24.     The Sherman Act was passed in 1890 as the first antitrust law in the United States.  It had as its goal to be a "comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade." *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 4 (1958).  "[T]he policy unequivocally laid down by the Act is competition." *Id.*

25.     To that end, Section 1 of the Sherman Act prohibits contracts, combinations, or conspiracies, that unreasonably restrain competition, and is focused on concerted activity between two or more firms.

26.     Section 2 of the Sherman Act makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . ."

27.     At its core, Section 2 of the Sherman Act makes it illegal to acquire or maintain monopoly power through improper means.

28.     This case involves both agreements between firms that unreasonably restrain competition, as well as single-firm conduct that represents an unlawful use of market power and monopolistic conduct.

### THE ECONOMICS OF MFNS

29.     MFNs instituted by companies with market power are concerning from an economic perspective for multiple reasons.  Steven C. Salop & Fiona Scott Morton, *Cover Story, Developing an Administrable MFN Enforcement Policy*, 27 Antitrust ABA 15, 18 (Spring 2013).

30.     Platform MFNs can harm competition by "keeping prices high and discouraging the entry of new platform rivals."  Jonathan A. Baker & Fiona Scott Morton, *Antitrust Enforcement Against Platform MFNs*, 127 Yale L.J. 2176, 2201 (May 2018) ("Baker I").

**FIRST AMENDED CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

31.     Platform MFNs guarantee that other platforms cannot charge a "lower final price, not because the focal platform has worked to ensure that it has the lowest cost, but rather because it has contracted for competitors' prices to be no lower." Baker I at 2178.

32.     MFNs disincentivize sellers from offering low prices, because discounts must be offered to all buyers.  Baker I at 2179.

33.     MFNs create artificial barriers to market entry:

> "[S]uppose an entrant wishes to gain customers by charging a lower price (perhaps because it has no established brand name or installed base).  It can profitably sell at a low price by undertaking selective contracting with suppliers willing to offer a discount in exchange for more volume or other favorable terms.  If those suppliers also supply the incumbent, however, an MFN imposed by the incumbent would require the supplier to charge the same price to the entrant.  This parity undermines the entrant's business model by preventing it from making an attractive offer to customers.  The symmetry that MFNs impose on the marketplace thus can prevent new competition that would lower prices."

Baker I at 2180.

34.     Platform MFNs, such as the Steam MFN (discussed below), prevent "outbreaks of competition" because they require each seller (e.g., game developers) selling on the Steam platform to "set the same price on a rival's or entrant's platform. This parity may undermine the discount . . . business model by preventing it from making attractive offers to" both game developers and consumers.  Baker I at 2181–82.

35.     When a platform imposes an MFN prohibiting lower prices on other platforms, it "serves to suppress competition on the crucial dimension of price[,]" and keeps new entrants from undercutting the dominant platform's commission, and, but for the MFN, driving consumers to the rival platform.  Benjamin Edelman & Julian Wright, *Price Restrictions in Multi-sided Platforms: Practices and Responses*, 10 Competition Policy Int'l 86 (Jan. 30, 2015).

36.     "Platform MFNs with greater scope and duration would be expected to have stronger anticompetitive effects."  Because of the vast number of game

developers selling on the Steam platform and subject to the Steam MFN, discount platforms are unable to complete.  Game developers are unwilling to price at a lower level, because they must do so across all platforms.  Baker I at 2182.

37.     Economic modeling demonstrates that when a dominant platform requires its sellers to agree to an MFN, there are (a) higher platform fees; (b) higher retail prices; and (c) firms with lower-cost models are discouraged from entry.  Andre Boik & Kenneth S. Courts, *The Effects of Platform Most-Favored Nation Clauses on Competition and Entry*, 59 J.L. & Econ. 105, 113–29 (Feb. 2016).

38.     As shown in the Boik & Courts model, a lower price entrant (such as Discord, discussed below) cannot successfully enter because the platform's MFN does not allow the entrant to lower prices to attract both sellers and consumers.  *See also, e.g.*, Ameila Fletcher & Morten Hviid, *Broad Retail Price MFN Clauses: Are They RPM "At Its Worst"?*, 81 Antitrust L.J. 1, 74 (2016) ("MFNs can restrict entry at the retail level.  Specifically, they can disadvantage potential retail competitors with low-end business models by eliminating such an entrant's ability to win customers away from the incumbent by offering lower prices and earning a smaller margin.").

39.     Additionally, MFNs "tend to raise industry prices" because they "kill a retailer's incentives to compete in the terms of trade that it offers suppliers.  The reason is that a retailer who raises the commission it charges . . . knows that the price set through its store will not increase relative to that at other stores. . . . This means that suppliers cannot asymmetrically adjust their prices to divert demand towards retailers offering more attractive contractual terms."  Justin P. Johnson, *The Agency Model and MFN Clauses*, The Review of Economic Studies, 1153–54 (Jan. 2017).

40.     MFNs thus "harm competition by assisting an incumbent in foreclosing the entry or expansion of rivals."  Jonathan B. Baker & Judith A. Chevalier, *The Competitive Consequences of Most-Favored-Nation Provisions*, 27 Antitrust No. 2, 24 (Spring 2013) ("Baker II").

**FIRST AMENDED CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

41.    MFNs harm competition "by making it impossible for a dominant incumbent firm's rivals, including entrants, to bargain . . . for a low price."  Baker II at 24.

42.    Indeed, real world examples show that, when platform MFNs are banned, prices to consumers fall.  Andrea Mantovani, et al., *The Dynamics of Online Hotel Prices and the EU Booking.com Case* NET Institute Working Paper No. 17-04 (2017), available at http://ssrn.com/abstract_id=3049339 [http://perma.cc/W9K9-Y546].  The leading booking site responded to the MFN ban by introducing quality improvements to the service it provided.  *See id.* at 6 tbl.1, suggesting online platform competition increased when platform MFNs were banned.

43.    As discussed herein, the Steam MFN: (a) raises prices to consumers; (b) prevents rival platforms from competing on price; (c) discourages new entry by a low-commission-charging platform; and (d) suppresses output by game developers.  Under the economics applicable to MFNs, the Steam MFN is anticompetitive.  Similarly, Valve's abuse of its market and monopoly power to keep pricing parity across platforms is anticompetitive.

## THE RELEVANT PRODUCT AND GEOGRAPHIC MARKETS

44.    The relevant product market is the market for sale of PC games to consumers.

45.    Alternatively, the relevant product market is the two-sided transactions market for the sale of PC games by game developers, through platforms, to consumers.

46.    Games designed to work on personal computers (e.g., desktops and laptops using a Microsoft or macOS operating system) are not compatible with and therefore do not work on game consoles (e.g., Microsoft Xbox or Sony PlayStation) or on mobile devices (e.g., iPhones or Android devices).  Accordingly, PC Games, console games, and mobile games are not substitutes for each other.

**FIRST AMENDED CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

47.     In a recent court filing attempting to stop third-party discovery into its business, Valve acknowledged that PC games do not compete with mobile games. *See, e.g.*, February 18, 2021 Joint Letter Brief Regarding Apple's Subpoena to Non-Party Valve Corporation, *Epic Games, Inc. v. Apple, Inc.*, Case No. 4:20-cv-05640-YGR, Docket 346 (the "Valve Letter").

48.     In the Valve Letter, Valve made the following admissions regarding the definition of the relevant product market:

(a)     "Valve is a privately held company with approximately 350 employees that develops PC video games.  Valve does not make or sell phones, tablets, or video games for mobile devices, or otherwise compete in the mobile market.  Valve also operates Steam, an online platform that lets users purchase and play PC games on their laptops and desktops.  Steam users cannot buy or use mobile apps on Steam."  Valve Letter at 5.

(b)     "Apple, Google and Samsung compete with each other in the mobile app market.  Valve does not compete in that market.  The Court already recognized the relevant market must include the product at issue.  (Case No. 20-cv-05640-YGR) (Dkt. 118 at 12) (citation omitted).  Apple argues the relevant market could be so broad as to include any video game available through any channel, but gives no evidence this might actually be true.  Indeed, the Court noted there is 'little evidence' iOS users owned multiple devices and changed from one to another in response to price changes.  *Id*. at 17 n.19."  Valve Letter at 6–7.

(c)     "Somehow, in a dispute over mobile apps, a maker of PC games that does not compete in the mobile market or sell 'apps' is being portrayed as a key figure.  It's not."  Valve Letter at 7.

**FIRST AMENDED CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

49.    Valve's concession that the mobile market and PC games market are different markets holds true for the console market as well.  Valve does not sell, market, or compete in the market for game-console games.

50.    The relevant geographic market for both the relevant product market and the alternative relevant product market is the United States and its territories.

51.    The MFN imposed by Valve, and agreed to by game developers or otherwise forced upon game developers, applies on a national basis.

52.    Approximately 75% of all PC games sold in the United States are sold through the Steam platform.

53.    The relevant market is highly concentrated, with only a handful of platforms and direct sales by game developers and other channels making up the additional 25% share.  Game developers do not need to use platforms to sell PC games; indeed some PC games are sold directly by game developers to consumers while others are sold by retailers such as Best Buy.  Accordingly, there are not indirect network effects in selling PC games on platforms.

54.    As discussed below, Valve has market and monopoly power in the relevant market because (a) it has a high market share; (b) it has the power to keep prices anticompetitively high; and (c) it has the power to exclude rivals.

## ALLEGATIONS

55.    Defendant Valve owns and operates Steam.  Steam is a platform for the distribution of PC Games.  The Steam platform was first released in 2003.  Since then, the Steam platform has become the dominant platform for third-party game publishing and purchasing.

56.    Through the Steam platform, Valve sells and distributes its own games, as well as third-party games.

57.    Valve, through the Steam platform, has an approximate 75% market share for the sale of PC Games.  Valve generates billions of dollars each year on

revenue from the Steam platform.  And, worldwide, the Steam platform has hundreds of millions of users.

58.     Game developers, seeking access to consumers such as Plaintiffs and the Class Members, market and sell their PC games on a platform.

59.     Game developers rely on platforms, such as Steam.  *See, e.g.*, Form 10-K for the Fiscal Year Ended December 31, 2020, Activision Blizzard, Inc., at 20.

60.     In order for game developers to sell on the Steam platform, Valve requires that game developers pay Valve a commission (which Valve terms a "revenue share") on all earnings on the Steam platform.  Before October 1, 2018, commissions for sales on Steam were 30%.  Effective as of October 1, 2018, Valve has three tiers for its commission fee: 30% on all of a game's earnings under $10 million; 25% on all of a game's earnings between $10 million and $50 million; and 20% on all of a game's earnings over $50 million.[2]  The vast majority of sales to consumers on the Steam platform are at the 30% commission rate.

61.     Game developers overwhelmingly believe that the Steam platform does not justify a 30% commission fee on their earnings.[3]  But because of the Steam platform's market and monopoly power, and Valve's maintenance of that market and monopoly power via the Steam MFN, game developers have no choice but to agree to pay these commissions.

62.     Valve does not set the price to consumers, game developers do.

63.     One risk facing game developers is that some—but not all—of their "channel partners . . . influence the fee structures for online distribution of games on

---

[2] *New Revenue Share Tiers and other updates to the Steam Distribution Agreement*, Steam,   https://steamcommunity.com/groups/steamworks/announcements/detail/ 1697191267930157838 (last visited March 22, 2021); *Valve now rewards successful games with a larger cut of Steam revenue*, Polygon, https://www.polygon.com/ 2018/12/3/18123649/valve-steam-revenue-sharing (last visited March 22, 2021).

[3] Game Developers Conference, *State of the Game Industry 2019*, Survey_GDC19_Report-State_of_the_Game_Industry.pdf.

their platforms."  Form 10-K for the Fiscal Year Ended March 31, 2020, Take-Two Interactive Software, Inc., at 15.  Upon information and belief, Valve is one such "channel partner" and it "retain[s] the right to change the fee structures for online distribution of . . . content [that is] distribut[ed] on" Steam.  *Id*.

64.    Upon information and belief, through Valve's actions and communications, Valve explicitly instructs or tacitly requires, through its conduct and communications, game developers to offer PC games on the Steam platform at the lowest price that the PC game is offered for sale on any other third-party platform or on the game developer's own website (the "Steam MFN"), and explicitly or implicitly threatens punishment for non-compliance.

65.    Valve abuses its market power and maintains its monopoly by coercing game developers to agree to the Steam MFN through various means and otherwise preventing game developers from differential pricing across platforms (the "monopolistic conduct").

66.    The Steam MFN and Valve's monopolistic conduct requires that a game developer's products cannot be sold on other platforms unless the product is also available for purchase on the Steam platform at no higher a price than is offered on any other service, website, or platform.  In other words, the Steam MFN and Valve's monopolistic conduct requires game developers to sell games through the Steam platform at the lowest price being offered on other platforms.

67.    One such example is that Valve requires game developers to abide by a set of rules called the "Steamworks Documentation."  *See* Steamworks Documentation,  https://partner.steamgames.com/doc/gettingstarted  (last visited March 22, 2021).

68.    The Steamworks Documentation contains the rules and requirements of selling games on Steam.  In order to sell games on Steam, game developers must follow the Steamworks Documentation.

FIRST AMENDED CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

69.     The Steamworks Documentation contains a number of provisions related to Steam Keys and inter-platform pricing.

70.     PC games are purchased through the Steam platform in two primary ways.  First, consumers can purchase games directly through Steam itself, through which the consumer submits the consumer's payment, allowing the consumer to then download and activate the game in Steam.  Alternatively, a consumer may purchase a PC game to be activated on the Steam platform from another online or brick-and-mortar retailer through what is called a "Steam Key."  A Steam Key is a software activation key that consists of a series of letters and numbers that facilitates the purchase of a PC game to be downloaded and played using the Steam platform through a retailer other than Steam.  These retailers can include brick-and-mortar stores or online storefronts.  Upon completion of the purchase from a third-party retailer, the consumer receives a Steam Key that they then input into Steam to allow the consumer to download and play the game in the Steam platform on their Steam account.

71.     Game developers agree to follow the following "Steam Key Rules and Guidelines":

>      (a)     You should use keys to sell your game on other stores in a similar way to how you sell your game on Steam.  It is important that you don't give Steam customers a worse deal.[4]
>
>      (b)     It's OK to run a discount on different stores at different times as long as you plan to give a comparable offer to Steam customers within a reasonable amount of time.

---

[4] A prior version of this language read: "You are welcome to generate keys for resale with other retailers, including your own website.  However, your product must also be available for sale on Steam.  If you are hoping to receive exposure to Steam customers, the price on Steam will have to match prices elsewhere."  In other words, Valve told game developers that they would be punished by losing "exposure to Steam customers" if they did not price at par across platforms.

**FIRST AMENDED CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

(c)  Occasionally it may make sense to offer your game in a bundle or subscription, timed at the right point in a game's life cycle.  Keep in mind that the perceived price in the bundle/subscription should be a price you are willing to run the game at a standalone price or discount on Steam.  Philosophically, you can think about it like any other discount: if you're making an aggressive offer in one place, make it elsewhere too.  **We want to avoid a situation where customers get a worse offer on the Steam store, so feel free to reach out to us via the Developer Support tool if you want to talk through a specific scenario.**

(d)  Steam keys shouldn't be given away for free if you aren't also offering the same deal (i.e., give the game away for free) to Steam customers.

Steamworks Documentation, https://partner.steamgames.com/doc/features/keys (emphasis in original) (last visited March 22, 2021).

72.  The Steamworks Documentation also states: "Please note that Steam keys cannot be sold on other sites unless the product is also available for purchase on Steam at no higher a price than is offered on any other service or website." Steamworks Documentation, https://partner.steamgames.com/doc/features/keys #:~:text=Please%20note%20that%20Steam%20keys,any%20other%20service%20o r%20website (last visited March 22, 2021).

73.  The "Steam Key Rules and Guidelines" provide that game developers selling Steam Keys on other platforms sell them at the same price they sell them for on Steam.  And they provide that if a game developer discounts a Steam Key on another platform, it likewise discounts the Steam Key on the Steam platform "within a reasonable amount of time."

74.  Developers agree to the "Steam Key Rules and Guidelines" under threat of punishment.  Valve states in the "Steam Key Rules and Guidelines" that it "reserves

-15-

the right to deny requests for keys or revoke key requesting privileges for partners that are abusing them or disadvantaging Steam customers" (i.e. partners who do not price at par across platforms). *See* Steamworks Documentation, https://partner.steamgames.com/doc/features/keys (last visited on March 22, 2021.)

75.   Upon information and belief, in 2018 Valve communicated with game developers that the foregoing rules contained in the Steamworks Documentation applied to **all** PC Games sold on **all** platforms.  In other words, Valve considered the terms of the Steamworks Documentation to include the Steam MFN.   The Steamworks Documentation, as interpreted by Valve and communicated by it to game developers, requires game developers to pricing parity for their PC games across all platforms, and not just for Steam Keys.

76.   Because game developers are required to abide by the Steamworks Documentation, game developers selling on Steam accepted Valve's interpretation of these terms, and accepted and agreed to abide by the Steam MFN.

77.   Similarly, upon information and belief, Valve has otherwise abused its market and monopoly power to force game developers to sell PC games at the same price on Steam as on other platforms.

78.   For example, upon information and belief, game developers have asked Valve if they are allowed to sell PC games at a lower price on platforms other than Steam.   In response to those communications, Valve either explicitly or tacitly communicates to the game developer that pricing parity is required.

79.   Similarly, upon information and belief, Valve monitors game pricing and enforces the Steam MFN.  Upon information and belief, when Valve identifies games being sold on other platforms at a lower price than on Steam, Valve takes steps to bring the game pricing back into compliance by, for example, emailing or calling the "offending" game developer and requiring the game developer to either (a) raise the price on the other platform(s) or (b) lower the price on Steam.

80.    "[T]here is a Steamworks Developer group where [game developers] can ask any questions that aren't answered by the [Steamworks D]ocumentation.  Valve employees are frequently answering questions in there, along with many other developers.  It's usually the quickest way to get a response as there are many people keeping an eye on the discussions."[5]

81.    Upon information and belief, Valve uses its participation in this (and perhaps other) group(s) to "remind" game developers about Valve's pricing parity requirements.

82.    For example, a Valve employee, "TomG," wrote on the developer group forum: "If you sell your game for $10 on our store and $5 on another, that's really unfair to our customers, and we'd want to either match that lower price, or just stop selling the game on Steam."  And he also wrote: "Think critically about how your decisions might affect Steam customers, and Valve.  If the offer you're making fundamentally disadvantages someone who bought your game on Steam, it's probably not a great thing for us or our customers (even if you don't find a specific rule describing precisely that scenario)."

83.    In that same thread, TomG responded to a question stating: "we usually choose not to sell games if they're being sold on our store at a price notably higher than other stores.  That is, we'd want to get that lower base price as well, or not sell the game at all."

84.    In other words, Valve's position to game developers is that it gets the best price or it will not sell the developers' games.  Valve's policy hurts, not helps, consumers, because consumers would benefit from lower-priced options for the same products.

85.    The game developer community is close-knit.  Game developers are aware of how Valve treats their peers, and thus Valve's tactics prevent game

---

[5] Steamworks Documentation, https://partner.steamgames.com/doc/gettingstarted/faq (last visited March 22, 2021).

**FIRST AMENDED CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

developers from violating the Steam MFN or otherwise pricing at lower levels on other platforms.

86.    Game developers have manifested their assent to the Steam MFN by following its rules regarding pricing parity; indeed, by their pricing conduct, game developers demonstrate that the Steam MFN applies to all PC games, and not just Steam Keys.

87.    For example, on December 17, 2020, Ubisoft (a game developer) discounted its game "Far Cry 4" from $29.99 (the list price it was selling for on Steam and Epic) to $8.99 on the Epic platform.  Consistent with the Steam MFN, five days later, Ubisoft discounted this game to $8.99 on the Steam platform.  Games sold on the Epic platform do not use Steam Keys.

88.    As another example, on March 19, 2019, Ubisoft discounted its game "Far Cry New Dawn" from $39.99 (the list price it was selling for on Steam and Uplay) to $19.99 on Ubisoft's own storefront, Uplay.  Consistent with the Steam MFN, three days later, Ubisoft discounted this game to $19.99 on the Steam platform. Games sold on Uplay do not use Steam keys.

89.    As another example, on September 9, 2020, Ubisoft discounted its game "Steep" from $29.99 (the list price it was selling for on Steam and Uplay) to $6.00 on Uplay.  Consistent with the Steam MFN, the next day, Ubisoft discounted this game to $5.99 on the Steam platform.

90.    As another example, on November 18, 2020, Ubisoft discounted its game "I Am Alive" from $14.99 (the list price it was selling for on Steam and Uplay) to $3.75 on Uplay.  Consistent with the Steam MFN, seven days later, Ubisoft discounted this game to $3.74 on the Steam platform.

91.    As another example, on October 7, 2020, Ubisoft discounted its game "Tom Clancy's Ghost Recon® Wildlands – Fallen Ghost" from $14.99 (the list price it was selling for on Steam and Uplay) to $4.50 on Uplay.  Consistent with the Steam MFN, eight days later, Ubisoft discounted this game to $4.49 on the Steam platform.

-18-

92.     As another example, on March 16, 2020, CD Projekt (a game developer) discounted its game "The Witcher 3: Wild Hunt" from $39.99 (the list price it was selling for on Steam and GOG) to $11.99 on the GOG platform.  Consistent with the Steam MFN, seven days later, CD Projekt discounted this game to $11.99 on the Steam platform.  Games sold on GOG do not use Steam keys.

93.     As another example, on February 10, 2021, Devolver (a game developer) discounted its game "Disc Room" from $14.99 (the list price it was selling for on Steam and GOG) to $11.99 on GOG.  Consistent with the Steam MFN, the next day, Devolver discounted this game to $11.99 on the Steam platform.

94.     As another example, on December 8, 2020, Devolver discounted its game "Carrion" from $19.99 (the list price it was selling for on Steam and GOG) to $14.99 on GOG.  Consistent with the Steam MFN, the next day, Devolver discounted this game to $14.99 on the Steam platform.

95.     There are numerous other examples of game developers pricing in accordance with the Steam MFN.

96.     As explained below, the Steam MFN is anticompetitive because it prevents rival platforms from competing with the Steam platform on price.  Likewise, Valve's other monopolistic conduct in forcing game developers to pricing parity across platforms is anticompetitive because it prevents rival platforms from competing with the Steam platform on price.  This lack of competition thereby harms consumers by keeping the prices they pay for PC games higher than they would be in a competitive market.

97.     The Steam MFN and Valve's monopolistic conduct harms consumers in a variety of ways by preventing price competition, hindering innovation, and suppressing output.

**The Steam MFN and Valve's Monopolistic Conduct Prevents Price Competition**

98.    The Steam MFN and Valve's monopolistic conduct prevents price competition for PC Games.  The Steam MFN and Valve's monopolistic conduct disincentivize game developers from dropping the price of PC games on other platforms to take advantage of lower commissions offered by competitors to the Steam platform.

99.    Indeed, other platforms have attempted to compete with the Steam platform via lower commissions.

100.   In 2018, Epic Games opened the Epic Games Store ("EGS").  Through EGS, Epic Games sells and distributes its own games as well as third-party games.  Epic Games charges a 12% commission to game developers on all earnings and is a direct competitor to the Steam platform.

101.   In an interview given shortly after EGS opened, Tim Sweeney, CEO of Epic, stated that "[f]ixed costs of developing and supporting the platform become negligible at a large scale.  In our analysis, stores charging 30 per cent are marking up their costs by 300 to 400 per cent," and that stores could be profitable earning a 12% commission.[6]

102.   Despite the significantly lower commission structure, PC games sold on EGS sell at the same price as they are sold for on the Steam platform as required by the anticompetitive Steam MFN.

103.   Discord Inc. owned and operated the Discord store, which sold and distributed third-party games only.  Around 2018, Discord began to tout itself as an alternative to the Steam platform.  Notably, Discord offered game developers a 90/10 revenue split (i.e., it charged a 10% commission to game developers on all earnings),

---

[6] *New Epic Games Store Takes on Steam With Just 12% Revenue Share*, MCV/Develop (Dec. 4, 2018) https://www.mcvuk.com/development-news/new-epic-games-store-takes-on-steam-with-just-12-revenue-share-tim-sweeney-answers-our-questions/ (last accessed Jan. 20, 2021).

**FIRST AMENDED CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

which was an aggressive strategy that curried favor with both big and small game developers.  Discord was thus a direct competitor to the Steam platform.

104.  When game developers released on Discord to take advantage of Discord's lower commission structure, Valve would reach out to the game developer for violating Valve's parity pricing requirements, chilling the game developer's ability to do business with Discord.

105.  In 2019, Discord shuttered its store.   Upon information and belief, because of the Steam MFN, Discord's low-price strategy was unable to drive volume to the Discord store.  Because of the Steam MFN and Valve's anticompetitive conduct, game developers could not take advantage of Discord's extremely generous revenue split.  In other words, the Steam MFN and Valve's anticompetitive conduct prevented Discord from competing for game developer sales.

106.  Despite Epic Games only charging a 12% commission, the following games (for example) were selling for the identical price on Steam and on EGS:

| Game Title | Steam Price (30% Commission) | Epic Price (12% Commission) |
|---|---|---|
| The Outer Worlds | $59.99 | $59.99 |
| Borderlands 3 | $59.99 | $59.99 |
| Remnant: From the Ashes | $39.99 | $39.99 |
| Surviving Mars | $29.99 | $29.99 |
| Amnesia: Rebirth | $29.99 | $29.99 |
| Oxygen Not Included | $24.99 | $24.99 |

| **Game Title** | **Steam Price** (30% Commission) | **Epic Price** (12% Commission) |
|---|---|---|
| Tom Clancy's Rainbow Six Siege | $19.99 | $19.99 |

107. Game developers are not independently choosing to price PC games at the same level across platforms; they are required to do so because of their agreement to the Steam MFN and because of Valve's monopolistic conduct.

108. Without the Steam MFN and without Valve's monopolistic conduct aimed at pricing parity, it would be in game developers' independent economic interest to offer their PC games at lower prices on platforms that charge a lower commission than the Steam platform because they could generate the same or even greater revenue per game as a result of the lower commissions, while lowering prices to consumers. Because of the Steam MFN and Valve's monopolistic conduct, game developers must account for the Steam platform's supracompetitive commissions and cannot and do not lower prices on rival platforms.

109. The following chart illustrates how the Steam MFN and Valve's monopolistic conduct prevents price competition:

|  | **Steam** | **Rival Platform** |
|---|---|---|
| Commission % | 30% | 12% |
| Sale $ to Consumer | $10.00 | $10.00 |
| Developer Income | $7.00 | $8.80 |

110. In other words, the Steam MFN and Valve's monopolistic conduct prevents rival platforms from increasing volume on their platforms by offering lower commission fees—because the PC game must be priced at the same level to consumers regardless of the commission the game developer pays, game developers cannot take advantage of the lower commission levels on other platforms. The Steam MFN and Valve's monopolistic conduct thus prevents inter-platform competition.

111.   The following chart shows how, in a world without the Steam MFN and without Valve's monopolistic conduct, game developers could earn higher profit at lower commissions, while increasing sales and benefitting consumers:

|  | Steam | Rival Platform |
|---|---|---|
| Commission % | 30% | 12% |
| Sale $ to Consumer | $10.00 | $8.00 |
| Developer Income | $7.00 | $7.04 |

112.   Thus, at a 12% commission, a game developer could lower its price by 20% and still earn more profit.  And, of course, consumers would benefit by lower prices.

113.   Indeed, in a January 30, 2019 tweet, Tim Sweeney, CEO of Epic, complained about how the Steam MFN and Valve's monopolistic conduct prevents price competition stating that "Steam has veto power over prices," preventing "multi-store [game] developer[s from] sell[ing] their game[s] for a lower price on the Epic Games store . . . ."  And three days later, also on Twitter, Mr. Sweeney discussed that "the only way for creators to pass savings on to gamers is by avoiding the dominant store [e.g., the Steam platform]."[7]

114.   Finally, on January 11, 2020, Mr. Sweeney tweeted about how price competition would work in a competitive market: "If the 88%/12% store wars were a coin toss, here's it goes: Heads, other stores don't respond, so Epic Games Store wins and all developers win.  Tails, competitors match us, we lose our revenue sharing advantage, and maybe other stores win, but all developers still win."[8]

---

[7] @TimSweeneyEpic, TWITTER (Jan. 30, 2019, 12:29 PM), https://twitter.com/TimSweeneyEpic/status/1090663312814157824; @TimSweeneyEpic, TWITTER (Feb. 2, 2019, 12:30 PM), https://twitter.com/TimSweeneyEpic/status/1091750761392979968
[8] @TimSweeneyEpic, TWITTER (Jan. 11, 2020, 3:07 PM) https://twitter.com/TimSweeneyEpic/status/1216089159946948620

FIRST AMENDED CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

115.    Another example of Valve's monopolistic conduct involves Ubisoft.

116.    Over the last three years, Ubisoft, a publicly traded company, averaged €1.76 billion in "Net Bookings" (i.e. "sales").[9]

117.    "For Years, Ubisoft released blockbuster titles like Assassin's Creed and Splinter Cell on Steam."  However, Ubisoft "decided not to sell the sequel to its hit game Tom Clancy's The Division on [Steam] because Valve would not modify its revenue-sharing model" according to Ubisoft's vice president for partnerships and revenue, Chris Early.  Ubisoft sold this hit PC game on Epic and its own platform.[10] Ubisoft was only able to do so because, in this limited circumstance, the popularity of the game and Ubisoft's ability to make higher margins on Epic and its own platform, outweighed Valve's market share and high revenue share.

118.    Despite Ubisoft not selling the sequel to Tom Clancy's The Division on Steam, and selectively refusing to release other popular new PC games on Steam, for games Ubisoft continues to sell on Steam, it sells them at the same price across platforms, thereby evidencing either an explicit or tacit agreement to maintain pricing parity across platforms:

| **Game Title** | **Steam Price** | **Uplay Price** | **Epic Price** |
|---|---|---|---|
| Space Junkies | $19.99 | $19.99 | N/S[11] |
| Trials Rising | $19.99 | $19.99 | $19.99 |
| Far Cry New Dawn | $39.99 | $39.99 | $39.99 |

[9] https://www.ubisoft.com/en-us/company/about-us/investors#collapse-keyFiguresAnnualReports; https://staticctf.akamaized.net/8aefmxkxpxwl/JdRZ01IK6RqlqhbMmjVvV/e4c8b94 2be090b6c1cb6d7035b1ec825/Ubisoftkeyfiguressept302020_tcm99-28749_tcm99-196733-32.xlsx (last accessed March 11, 2021)

[10] The New York Times, *Fortnite Maker Wants to Sell More Games, and Build a Platform to Do It*, Published Aug. 27, 2019, Updated Aug. 13, 2020.

[11] The written abbreviation "N/S" indicates that the game is "Not for Sale" on a particular platform.

| **Game Title** | **Steam Price** | **Uplay Price** | **Epic Price** |
|---|---|---|---|
| Assassin's Creed Odyssey | $59.99 | $59.99 | $59.99 |
| Transference | $24.99 | $24.99 | N/S |
| The Crew 2 | $49.99 | $49.99 | $49.99 |
| Far Cry 5 | $59.99 | $59.99 | $59.99 |
| Discovery Tour By Assassin's Creed: Ancient Egypt | $19.99 | $19.99 | N/S |
| Assassin's Creed Origins | $59.99 | $59.99 | $59.99 |
| South Park The Fractured But Whole | $49.99 | $49.99 | $49.99 |
| Atomega | $9.99 | $9.99 | N/S |
| Monopoly Plus | $14.99 | $14.99 | $14.99 |
| Star Trek: Bridge Crew | $24.99 | $24.99 | N/S |
| Tom Clancy's Ghost Recon Wildlands | $49.99 | $49.99 | $49.99 |
| Uno | $9.99 | $9.99 | $9.99 |
| Eagle Flight | $19.99 | $19.99 | N/S |
| Werewolves Within | $19.99 | $19.99 | N/S |
| Steep | $29.99 | $29.99 | $29.99 |
| Watch_Dogs 2 | $49.99 | $49.99 | $59.99 |
| Just Dance 2017 | $49.99 | $49.99 | N/S |
| Champions of Anteria | $29.99 | $29.99 | N/S |
| Trials of The Blood Dragon | $14.99 | $14.99 | N/S |
| Trackmania Turbo | $39.99 | $39.99 | $39.99 |
| Tom Clancy's The Division | $29.99 | $29.99 | $29.99 |
| Assassin's Creed Chronicles: Russia | $9.99 | $9.99 | N/S |
| Assassin's Creed Chronicles: India | $9.99 | $9.99 | N/S |
| Tom Clancy's Rainbow Six Siege | $19.99 | $19.99 | $19.99 |
| Assassin's Creed Syndicate | $29.99 | $29.99 | $29.99 |
| Anno 2205 | $39.99 | $39.99 | $39.99 |
| Zombi | $19.99 | $19.99 | $19.99 |
| Assassin's Creed Chronicles: China | $9.99 | $9.99 | N/S |
| Assassin's Creed Rogue | $19.99 | $19.99 | $19.99 |
| Far Cry 4 | $29.99 | $29.99 | $29.99 |
| Assassin's Creed Unity | $29.99 | $29.99 | $29.99 |
| Valiant Hearts: The Great War | $14.99 | $14.99 | $14.99 |

**FIRST AMENDED CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

| **Game Title** | **Steam Price** | **Uplay Price** | **Epic Price** |
|---|---|---|---|
| Watch_Dogs | $29.99 | $29.99 | N/S |
| Child of Light | $14.99 | $14.99 | N/S |
| Trials Fusion | $19.99 | $19.99 | N/S |
| South Park: The Stick of Truth | $29.99 | $29.99 | $29.99 |
| Assassin's Creed Freedom Cry | $14.99 | $14.99 | N/S |
| Might & Magic X- Legacy | $24.99 | $24.99 | N/S |
| Assassin's Creed Liberation HD | $19.99 | $19.99 | N/S |
| Assassin's Creed IV Black Flag | $19.99 | $19.99 | N/S |
| Flashback | $9.99 | $9.99 | N/S |
| Rayman Legends | $29.99 | $29.99 | $29.99 |
| Tom Clancy's Splinter Cell Blacklist | $29.99 | $29.99 | N/S |
| Trackmania Valley | $19.99 | $19.99 | N/S |
| Trackmania Stadium | $9.99 | $9.99 | N/S |
| Might & Magic: Heroes VI - Shades of Darkness | $14.99 | $14.99 | N/S |
| Far Cry 3- Blood Dragon | $14.99 | $14.99 | $14.99 |
| Trials Evolution: Gold Edition | $19.99 | N/S | $19.99 |
| Trackmania Canyon | $19.99 | $19.99 | N/S |
| Far Cry 3 | $19.99 | $19.99 | $19.99 |
| I Am Alive | $14.99 | $14.99 | N/S |
| Tom Clancy's Ghost Recon | $19.99 | $19.99 | N/S |
| Rayman Origins | $19.99 | $19.99 | $19.99 |
| Assassin's Creed Revelations | $19.99 | $19.99 | N/S |
| Anno 2070 - Complete Edition | $29.99 | $29.99 | N/S |
| Might & Magic: Heroes VI | $19.99 | $19.99 | N/S |
| From Dust | $14.99 | $14.99 | N/S |
| Assassin's Creed Brotherhood | $19.99 | $19.99 | N/S |
| Prince of Persia: The Forgotten Sands | $9.99 | $9.99 | N/S |
| Tom Clancy's Splinter Cell Conviction Deluxe Edition | $19.99 | $19.99 | N/S |
| Tom Clancy's Splinter Cell Conviction | $19.99 | $19.99 | N/S |
| Assassin's Creed 2 Deluxe Edition | $19.99 | $19.99 | N/S |

**FIRST AMENDED CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

| **Game Title** | **Steam Price** | **Uplay Price** | **Epic Price** |
|---|---|---|---|
| Silent Hunter 5: Battle of the Atlantic | $9.99 | $9.99 | N/S |
| Tom Clancy's Splinter Cell Chaos Theory | $9.99 | $9.99 | N/S |
| Tom Clancy's Endwar | $9.99 | $9.99 | N/S |
| Tom Clancy's Splinter Cell Double Agent | $9.99 | $9.99 | N/S |
| Driver Parallel Lines | $9.99 | $9.99 | N/S |
| Prince of Persia | $9.99 | $9.99 | N/S |
| Prince of Persia: The Sands of Time | $9.99 | $9.99 | N/S |
| Prince of Persia: Warrior Within | $9.99 | $9.99 | N/S |
| Prince of Persia: The Two Thrones | $9.99 | $9.99 | N/S |
| Far Cry 2: Fortune's Edition | $9.99 | $9.99 | $9.99 |
| Heroes of Might & Magic V: Tribes of the East | $9.99 | $9.99 | N/S |
| Heroes of Might & Magic V: Hammers of Fate | $9.99 | $9.99 | N/S |
| Brothers In Arms: Earned In Blood | $9.99 | $9.99 | N/S |
| Brothers in Arms: Hell's Highway | $9.99 | $9.99 | N/S |
| Tom Clancy's Rainbow Six 3 Gold | $9.99 | $9.99 | N/S |
| Silent Hunter: Wolves of the Pacific | $9.99 | $9.99 | N/S |
| Rayman Raving Rabbids | $9.99 | $9.99 | N/S |
| Silent Hunter: Wolves of the Pacific U-Boat Missions | $9.99 | $9.99 | N/S |
| Tom Clancy's Rainbow Six Lockdown | $9.99 | $9.99 | N/S |
| Beyond Good and Evil | $9.99 | $9.99 | $9.99 |
| Heroes of Might & Magic V | $9.99 | $9.99 | N/S |
| Brothers In Arms: Road To Hill 30 | $9.99 | $9.99 | N/S |
| Cold Fear | $9.99 | $9.99 | N/S |
| Tom Clancy's Rainbow Six Vegas 2 | $9.99 | $9.99 | N/S |
| Tom Clancy's Rainbow Six Vegas | $9.99 | $9.99 | N/S |
| Assassin's Creed: Director's Cut Edition | $19.99 | N/S | $19.99 |
| Far Cry | $9.99 | $9.99 | $9.99 |

FIRST AMENDED CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

| **Game Title** | **Steam Price** | **Uplay Price** | **Epic Price** |
|---|---|---|---|
| Tom Clancy's Splinter Cell | $9.99 | $9.99 | N/S |
| Dark Messiah of Might & Magic | $9.99 | $9.99 | N/S |

119.   Thus, where Ubisoft sells games on Steam, it sells them at the same price despite the significantly lower commissions it pays on its own platform and on Epic.

120.   Similarly, in compliance with the Steam MFN (including Valve's rules requiring inter-platform pricing parity), when other game developers sell across platforms, they sell PC games at the same price or, in the case of discounts on other platforms, they discount the price on Steam shortly thereafter.

121.   For games not sold on Steam, Ubisoft's pricing varies.  When Ubisoft is selling PC games on platforms other than Steam, it will sometimes take advantage of lower commissions—in Ubisoft's case, 0% on Uplay as compared to 12% on Epic— to price games at a lower price point on the less expensive platform.

122.   For example, on January 28, 2021 (the day the original complaint in this action was filed), Ubisoft discounted its PC game "Assassin's Creed Valhalla" from $59.99 (the list price it was selling for on Uplay and Epic) to $49.79 on its Uplay platform.  Ubisoft again discounted this game on February 11, 2021, to $44.99 on its Uplay platform while also discounting this game to $49.79 on the Epic platform.

123.   As another example, again on January 28, 2021, Ubisoft discounted its PC game "Watch Dogs: Legion" from $59.99 (the list price it was selling for on Uplay and Epic) to $40.19 on its Uplay platform.  Ubisoft again discounted this game on February 17, 2021, to $35.99 on its Uplay platform while also discounting this game to $40.19 on the Epic platform.

124.   If platforms were to compete for game developers via lower commissions in a competitive market unfettered by the Steam MFN and Valve's monopolistic conduct, the Steam platform would have to either lower its commissions or otherwise increase the value of its platform to consumers.  The Steam MFN and

-28-

Valve's monopolistic conduct saves the Steam platform from competing on the merits with other platforms.

**The Steam MFN and Valve's Monopolistic Conduct Hinder Innovation**

125. The Steam MFN and Valve's monopolistic conduct also hinder innovation by creating an artificial barrier to entry for platforms. When a market, such as this one, is highly concentrated, a new entrant can benefit consumers by undercutting the incumbent's prices. The ability to provide PC games to consumers at lower prices is one way a firm or new entrant could gain market share. If this market functioned properly—that is, if Valve did not abuse its market and monopoly power, the Steam MFN did not exist, and platforms were able to compete on price—platforms competing with Steam would be able to provide the same (or higher) margins to game developers while simultaneously providing lower prices to consumers.

126. As discussed above, Discord entered the market in 2018 charging a 10% commission—a commission that was two-thirds less than Steam's. Discord quickly left the market, upon information and belief, because of the anticompetitive effect of the Steam MFN and Valve's monopolistic conduct. Despite Discord's low commission, game developers had to price their games at the same level as they did on the Steam platform. Accordingly, Discord, as a new market entrant with a low-cost solution, was unable to gain critical mass among consumers because game developers were unable to take advantage of Discord's lower cost structure.

**The Steam MFN and Valve's Monopolistic Conduct Suppresses Output**

127. Finally, the Steam MFN and Valve's monopolistic conduct suppresses output—it is a basic tenet of economics that lower prices lead to increased sales. Accordingly, because of Valve's abuse of its market and monopoly power and the Steam MFN's effect on prices, fewer PC games are sold (both in volume and in titles) than would be sold in a competitive market.

**FIRST AMENDED CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

128.   The Discord example also illustrates this point.  Without Valve's abuse of its market and monopoly power and the Steam MFN, Discord's competitive pricing would have enticed game developers to price PC games at a lower level than they did on the Steam platform, because game developers would have been able to preserve their margins while selling more games.  Absent Valve's abuse of its market and monopoly power and the Steam MFN, a game developer that sold a game for $10 on the Steam platform could have sold the same game for $7.78 on the Discord platform and made the same $7 in gross profit.  The lower price, economic theory holds, would have increased demand for that game, thereby increasing the volume of sales.

129.   In a world without Valve's abuse of its market and monopoly power and the Steam MFN, game developers would sell more PC games at the same level of profit, consumers would spend less money per PC Game, and consumers would purchase more PC Games.  Valve's abuse of its market and monopoly power and the Steam MFN thus harm consumers.

## CLASS ACTION ALLEGATIONS

130.   Plaintiffs seek to represent two classes and two sub-classes (the "Class Members") under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) for violations of 15 U.S.C. §§ 1 & 2.

(a)      The first class, "Class I," seeks damages for violations of 15 U.S.C. §§ 1 & 2 and is defined as:

All persons that have purchased PC games in the United States and its territories at any time from and after four years before the filing of this lawsuit.  This Class does not include the named Defendant, its directors, officers, or members of their families, or the United States Government.

(b)      The Parent Purchaser Sub-Class of Class I is defined as:

All parents/guardians who (a) are not Steam platform users, and thus have not agreed to the Steam Subscriber Agreement, and (b) have purchased PC games in the United States and its territories for their

-30-

children/dependents at any time from and after four years before the filing of this lawsuit. This Class does not include the named Defendant, its directors, officers, or members of their families, or the United States Government.

(c)     The second class, "Class II," seeks declaratory and injunctive relief for violations of 15 U.S.C. §§ 1 & 2 and is defined as:

All persons that are currently purchasing PC games in the United States and its territories at any time from and after four years before the filing of this lawsuit. This Class does not include the named Defendant, its directors, officers, or members of their families, or the United States Government.

(d)     The Parent Purchaser Sub-Class of Class II is defined as:

All parents/guardians who (a) are not Steam platform users, and thus have not agreed to the Steam Subscriber Agreement, and (b) are currently purchasing PC games in the United States and its territories for their children/dependents at any time from and after four years before the filing of this lawsuit. This Class does not include the named Defendant, its directors, officers, or members of their families, or the United States Government.

131.   Plaintiffs Sean Colvin, Everett Stephens, and Ryan Lally bring this action under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of themselves and all others similarly situated. These Plaintiffs are members of the Classes, their claims are typical of the claims of the other Class Members, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs are represented by counsel whom are competent and experienced in the litigation of class-action and antitrust litigation. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other Class Members.

**FIRST AMENDED CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

132.   Plaintiffs Susann Davis and Hope Marchionda bring this action under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of themselves and all others similarly situated.  These Plaintiffs are members of the Parent Purchaser Sub-Classes, their claims are typical of the claims of the other Parent Purchaser Sub-Class Members, and Plaintiffs will fairly and adequately protect the interests of the Parent Purchaser Sub-Classes.  Plaintiffs are represented by counsel whom are competent and experienced in the litigation of class-action and antitrust litigation. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other Class Members in both the Class and the Parent Purchaser Sub-Class.

133.   The anticompetitive conduct of Defendant alleged herein has imposed, and threatens to continue to impose, a common antitrust injury on the Class Members.

134.   The Class Members number in the tens of millions and are thus so numerous that joinder of all members is impracticable.

135.   The identity of all Class Members is known by the Defendant. Defendant can identify the Class Members via its internal records, including, but not limited to, their financial, membership, and purchase history records.

136.   Defendant's relationships with the Class Members and Defendant's anticompetitive conduct has been substantially uniform.  Common questions of law and fact will predominate over any individual questions of law and fact.  Defendant has acted and continues to act on grounds generally applicable to Class Members, thereby making appropriate final injunctive relief with respect to Class Members as a whole.

137.   There will be no extraordinary difficulty in the management of this Class Action.  Common questions of law and fact exist with respect to all Class Members and predominate over any questions solely affecting individual class members. Among the questions of law and fact common to Class members are the following:

(a)   Monopolization issues:

**FIRST AMENDED CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

1.      Whether Valve's Steam platform has market power in the relevant product and geographic markets;

2.      Whether Valve has unlawfully monopolized, attempted to monopolize, or illegally maintained its monopoly in the market for sale of PC games to consumers, including by way of contractual terms, policies, practices, mandates, and restraints described herein in the United States and its territories;

3.      Whether competition in the market for sale of PC games to consumers has been restrained and harmed by Valve's monopolization, or attempted monopolization;

4.      Whether consumers and Class members have been damaged by Defendant's conduct;

5.      The amount of any damages; and

6.      The nature and scope of injunctive relief necessary to restore a competitive market.

(b)     Agreement issues:

1.      Whether game developers agreed to the Steam MFN;

2.      Whether Valve required, forced, or coerced game developers to unlawfully contract, combine, or conspire to unreasonably restrain trade in violation of Section 1 of the Sherman Act by agreeing under the Steam MFN that game developers would not sell their PC game products through competing platforms at a price lower than what they offered through Valve's Steam platform;

3.      Whether Valve required, forced, or coerced game developers to unlawfully contract, combine, or conspire to unreasonably restrain trade in violation of Section 1 of the

Sherman Act by agreeing under the Steam MFN that Valve would penalize game developers if they offered their PC game products through competing platforms at a price lower than what they offered through Valve's Steam platform;

4.    Whether competition in the market for sale of PC games to consumers has been restrained and harmed by Defendant's contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act;

5.    Whether consumers and Class members have been damaged by Defendant's conduct;

6.    The amount of any damages; and

7.    The nature and scope of injunctive relief necessary to restore a competitive market.

138.   These and other questions of law and fact are common to Class Members and predominate over any issues affecting only individual class members.

139.   The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

140.   This Class Action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible.  The damages suffered by many Class Members are small in relation to the expense and burden of individual litigation, and therefore, it is highly impracticable for such Class Members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

**FIRST AMENDED CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

# CLAIMS FOR RELIEF

## Count 1: Violation of Section 2 of the Sherman Act

141.   Plaintiffs incorporate by reference the allegations contained herein as if fully rewritten in this paragraph.

142.   Valve, utilizing the Steam platform, has monopolized the relevant market.  Valve is abusing its market and monopoly power and likewise using the Steam MFN to maintain its monopoly.

143.   Valve has monopoly power in the relevant market.

144.   The combination of its market share, its conduct towards game developers, and the Steam MFN allow Valve to price commissions to game developers (and thus the ultimate sale price to consumers) in an anticompetitive manner.

145.   Valve's abuse of its market and monopoly power and the Steam MFN keeps Valve's commission revenue from falling.

146.   The facts that Epic charges a 12% commission and Discord charged a 10% commission show that Valve is a monopolist.   In other words, Valve's commissions, and thus consumer prices, are substantially above the competitive level.

147.   In a world without Valve abusing its market and monopoly power, platform commissions (and thus consumer prices) may be even lower than the lower commissions charged by rival platforms in the actual world, as competitive forces would push platforms to price their commissions based on their costs and in reaction to how their competition is acting.

148.   In a world without the Steam MFN, platform commissions (and thus consumer prices) may be even lower than the lower commissions charged by rival platforms in the actual world, as competitive forces would push platforms to price their commissions based on their costs and in reaction to how their competition is acting.

149.   The ability of Valve to require game developers to agree to the Steam MFN demonstrates its monopolization of the market.

150.   The ability of Valve to otherwise require game developers to pricing parity across platforms demonstrates its monopolization of the market.

151.   Valve maintains its monopoly by engaging in exclusionary and anticompetitive conduct.

152.   As discussed herein, the Steam MFN and Valve's abuse of its market power and monopolistic conduct prevents commission competition, which would lower both the Steam platform's market share and Valve's profits.  This conduct both excludes rival platforms—both those in existence and potential new market entrants—and is by its very nature anticompetitive.  In a world where platforms competed on commissions—a world without the Steam MFN and in a world without Valve acting anticompetitively—consumer prices would be lower and output would be higher.

153.   By imposition of the Steam MFN, Valve has amassed and/or maintained monopoly power and is actually using that power to hinder competition.

154.   Similarly, as alleged above, Valve has abused its market power to prevent competition and maintain its monopoly.

155.   Valve's conduct is designed to (a) monopolize the market, and (b) maintain its monopoly in the market.  Accordingly, Valve has violated Section 2 of the Sherman Act.

156.   Every day the Steam MFN remains in effect, Valve will continue to violate Section 2 of the Sherman Act.

157.   Likewise, every day that Valve abuses its monopoly power to prevent price competition, to suppress output, and to hinder innovation, Valve will continue to violate Section 2 of the Sherman Act.

### Count 2: Violation of Section 1 of the Sherman Act

158.   Plaintiffs incorporate by reference the allegations contained herein as if fully rewritten in this paragraph.

**FIRST AMENDED CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

159.   Game developers either explicitly or tacitly agree with Valve to the Steam MFN.

160.   The Steam MFN, as discussed herein, is anticompetitive.  It has the effect of game developers charging consumers more than the game developers would in a competitive market.

161.   Valve, by requiring, forcing, or coercing game developers to restrain trade and cause increased consumer prices, has violated Section 1 of the Sherman Act.

162.   Every day the Steam MFN remains in effect, Valve will continue to violate Section 1 of the Sherman Act.

## PRAYER FOR RELIEF

163.   WHEREFORE, Plaintiffs, on behalf of themselves and the Classes and Subclasses, pray for relief and judgment as follows:

(a)   Judgment in favor of each Plaintiff and each Class Member against the Defendant in an amount to be determined at trial including, but not limited to, compensatory damages for past and future injury, trebled damages, and pre-judgment and post-judgment interest, as permitted by law;

(b)   A declaration that the Steam MFN is anticompetitive and constitutes illegal monopolization and monopoly maintenance in violation of Section 2 of the Sherman Act;

(c)   A declaration that the Steam MFN is anticompetitive and constitutes an illegal contract in restraint of trade in violation of Section 1 of the Sherman Act;

(d)   A declaration that Valve cannot use its market power to require game developers to pricing parity across platforms.

(e)   Permanent injunctive and equitable relief sufficient to eliminate the anticompetitive effects of the Defendant's actions, including but not limited to:

**FIRST AMENDED CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

1.        1.     Enjoining the Steam MFN;

2.        2.     Enjoining the Defendant from instituting or agreeing to any new anticompetitive provision that would have the effect of suppressing price competition in the market;

3.        3.     Enjoining the Defendant from influencing or controlling game developers' prices;

4.        4.     Requiring the Defendant to take affirmative action to facilitate competition in the market;

(f)     An award of the cost of the suit, including reasonable attorney's fees; and

(g)     Such other and further relief as this court deems just, equitable, and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Local Rule 38-1, Plaintiffs demand a trial by jury of all issues so triable.

VORYS, SATER, SEYMOUR AND PEASE LLP

*/s/ Thomas N. McCormick*
Thomas N. McCormick (CA: 325537)
4675 MacArthur Court
Suite 700
Newport Beach, CA 92660
(949) 526-7903 / Fax: (949) 383-2384
tnmccormick@vorys.com

Kenneth J. Rubin (*admitted pro hac vice*)
Timothy B. McGranor (*admitted pro hac vice*)
Kara M. Mundy (*admitted pro hac vice*)
52 East Gay Street, P.O. Box 1008
Columbus, OH 43216-1008
(614) 464-6400 / Fax: (614) 719-6350
kjrubin@vorys.com
tbmcgranor@vorys.com
kmmundy@vorys.com

*Attorneys for Plaintiffs and Putative Class*

-38-

**FIRST AMENDED CLASS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing *First Amended Class Complaint for Damages and Injunctive Relief* has been served via the CM/ECF system, pursuant to L.R. 5-3.2.1, this 8th day of April, 2021, upon the following:

**Valve Corporation**
Charles B. Casper
Montgomery McCracken Walker and Rhoads LLP
1735 Market Street
Philadelphia, PA 19103
ccasper@mmwr.com

Gavin Skok
Fox Rothschild LLP
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
gskok@foxrothschild.com

Mhare Mouradian
Fox Rothschild LLP
10250 Constellation Blvd., Suite 900
Los Angeles, CA 90067
mmouradian@foxrothschild.com


*/s/ Thomas N. McCormick*
Thomas N. McCormick

-39-